# Applicability of the Emoluments Clause to Non-Government Members of ACUS

The Emoluments Clause of the Constitution prohibits non-government members of the Administrative Conference of the United States from accepting, absent Congress's consent, a distribution from their partnerships that includes some proportionate share of the revenues generated from the partnership's foreign government clients

Non-government members of ACUS are also generally forbidden, absent Congress's consent, from accepting payments from commercial entities owned or controlled by foreign governments.

October 28, 1993

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

This memorandum responds to your request of July 30, 1993, which sought clarification of a portion of our April 29, 1991, letter to the Deputy Counsel to the President.[1] Specifically, you raise two questions concerning the advice we gave on that occasion concerning the scope and application of the Emoluments Clause, U.S. Const. art. I, § 9, cl. 8. After noting that a significant number of the 101 members of the Administrative Conference (the "Conference" or "ACUS") are lawyers in private practice, professors of law, or other experts in administrative law, you ask whether the Emoluments Clause prevents service on the Conference by a private individual who receives a partnership distribution from his or her firm that may include income received by the firm from a foreign government solely because of the pooling of partnership revenues. Further, you ask whether the Clause prevents service on the Conference by a private individual who receives payment from government-owned or controlled instrumentalities that do not engage in traditional functions — including, but not limited to, foreign public universities.

## I.

Congress established the Conference "to provide suitable arrangements through. which Federal agencies, assisted by outside experts, may cooperatively study mutual problems, exchange information, and develop recommendations for action by proper authorities to the end that private rights may be fully protected and regula-

---

[1] Your request is set forth in the Letter for Daniel Koffsky, Esq., Acting Assistant Attorney General, Office of Legal Counsel, from Gary J Edles, General Counsel, Administrative Conference of the United States (July 30, 1993) ("ACUS Letter"). The opinion to which your letter refers is *Applicability of 18 U.S.C § 219 to Members of Federal Advisory Committees*, 15 Op. O.L.C. 65 (1991) ("the April 1991 Opinion")

tory activities and other Federal responsibilities may be carried out expeditiously in the public interest." 5 U.S.C. § 591; *see also* Marshall J. Breger, *The Administrative Conference of the United States: A Quarter Century Perspective*, 53 U. Pitt. L. Rev. 813, 814-19 (1992) ("Breger") (discussing origins and purposes of ACUS). "The bulk of the Conference's work has been its research function and it is here that it has performed its most important role as a ventilator of new ideas in administrative procedure." *Id.* at 829. The Conference must transmit an annual report to the President and Congress and such interim reports as the Chairman considers desirable. *See* 5 U.S.C. § 595(c). In addition, "[o]n a number of occasions, Congress has specifically mandated that the Conference undertake particular activities." Breger at 835.

The Conference consists of not more than 101 nor fewer than 75 members, including a Chairman appointed by the President with the advice and consent of the Senate, the chairman (or designee) of each independent regulatory board or commission, the head (or designee) of each executive department or other administrative agency which is designated by the President, certain other governmental members, certain Presidential appointees, and "not more than 40 other members appointed by the Chairman." 5 U.S.C. § 593. The Chairman's appointees "may at no time be less than one-third nor more than two-fifths of the total number of members." *Id.* § 593(b)(6). The Chairman is to select appointees "in a manner which will provide broad representation of the views of private citizens and utilize diverse experience. The members shall be members of the practicing bar, scholars in the field of administrative law or government, or others specially informed by knowledge and experience with respect to Federal administrative procedure." *Id.*

Apart from the Chairman, the members of the Conference are not entitled to payment for their services. 5 U.S.C. § 593(c). Non-government members of the Conference may be deemed to be special government employees within the meaning of 18 U.S.C. § 202 and subject to the provisions of 18 U.S.C. §§ 201-224. *See* 1 C.F.R. § 302.5(a) (1993).

The membership of the Conference meeting in plenary session constitutes the Assembly. 5 U.S.C. § 595(a). The Assembly has various powers, including that of "adopt[ing] such recommendations as it considers appropriate for improving administrative procedure." *Id.* § 595(a)(1). "Conference recommendations and statements are published in the *Federal Register* and then codified in the Code of Federal Regulations." Breger at 827-28. "Since its establishment, the Conference's recommendations have had a significant effect on the workings of the federal government." *Id.* at 831.

The Conference includes a Council composed of the Chairman and ten other members appointed by the President, "of whom not more than one-half shall be employees of Federal regulatory agencies or Executive departments." 5 U.S.C. § 595(b). The Council may exercise various powers, including calling meetings of the Conference, proposing by-laws and regulations, making recommendations to

the Conference on subjects germane to its purpose, and receiving and considering reports of Conference committees[2] and distributing such reports to Conference members with the Council's own views and recommendations. *Id.*

## II.

The Emoluments Clause, U.S. Const. Art. I, § 9, cl. 8, provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

The Emoluments Clause was adopted unanimously at the Constitutional Convention, and was intended to protect foreign ministers and other officers of the United States from undue influence and corruption by foreign governments. James Madison's notes on the Convention for August 23, 1787, report:

> Mr[.] Pinkney urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence and moved to insert — after Art[.] VII sect[.] 7. the clause following — "No person holding any office of profit or trust under the U.S. shall without the consent of the Legislature, accept of any present, emolument, office or title of any kind whatever, from any King, Prince or foreign State["] which passed nem: contrad.

2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966 reprint); *see also* 3 *id.* at 327 (remarks of Governor Randolph); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing history of ratification of Clause).

## A.

The ACUS Letter represents that, typically, half of the Council members come from outside the Federal government, as do somewhat less than half (i.e., approximately forty) of the remaining Conference members. It points out that these private members "are typically lawyers in private practice, law professors, and other

---

[2] Under its by-laws, the Conference has six standing committees: adjudication, administration, governmental processes, judicial review, regulation and rulemaking. *See* 1 C.F.R § 302 3. In addition, with the approval of the Council the Chairman may establish special ad hoc committees and assign special projects to them. *Id.* The committees, which include both government and non-government members, are "vital to the Conference's research and review process." Breger at 826.

experts in administrative law and government." ACUS Letter at 1. Some of the Conference members are partners in law firms that include foreign governments among their clients. Although we are informed that these Conference members do not personally represent foreign governmental clients and have no dealings with them, "their partnership arrangements provide that client revenues are pooled in some fashion so that the member receives a partnership distribution from the firm that includes some proportionate share of revenues generated by those partners who have the foreign government among their clients." *Id.* at 2. ACUS asks whether such members are barred from Conference service by the Emoluments Clause.

As a threshold matter, ACUS does not dispute that Conference members from the private sector (who are unpaid for their services to the Conference) occupy an "Office of . . . Trust" within the meaning of the Emoluments Clause. We believe that Conference membership is such an office. To begin with, the Conference is a Federal agency established by statute. *See* 5 U.S.C. § 593. By virtue of their positions within that agency, Conference members are necessarily brought within the Clause. Although the Conference is an advisory committee as well as an agency, *see* ACUS Letter at 1, the April 1991 opinion stated that "Federal advisory committee members hold offices of profit or trust within the meaning of the Emoluments Clause," 15 Op. O.L.C. at 68, and we do not understand ACUS to be contesting that view. Moreover, the Conference's advice and recommendations have had (and were intended to have) a significant effect on the Government's administrative processes. Indeed, Congress has from time to time assigned specific statutory missions to the Conference, requiring it to assist other Federal agencies and demonstrating that the Conference's membership occupies a trusted and confidential role in governmental decisionmaking.[3] Finally, under the Conference's own by-laws, its members may be considered to be special government employees subject to Federal conflict of interest statutes and regulations. *See* 1 C.F.R. § 302.5(a). Accordingly, we have no difficulty in concluding that the non-government members of the Conference occupy offices subject to the Clause. *See Offices of Trust*, 15 Op. Att'y Gen. 187, 188 (1877) (Commissioners appointed by the President for the Centennial Exhibition hold offices of "Trust" under Clause because they were entrusted with duties "on account of their personal qualifications and fitness for the place."); *see also Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986) (reviewing prior opinions).

---

[3] For example, the Magnuson-Moss Warranty Act, § 202(d) 15 U S C. § 57a note, directed ACUS to study the Federal Trade Commission's "hybrid" rulemaking procedures. The Government in the Sunshine Act § 3(a), 5 U S C. § 552b(g), required agencies affected by the Act's open meeting requirements to consult with ACUS in developing their regulations The Equal Access to Justice Act § 203(a)(1), 5 U S C. § 504(c)(1), required agencies to consult with ACUS before establishing uniform procedures for the submission and consideration of applications for awards of fees and expenses *See* Breger at 835-36.

ACUS suggests that the Emoluments Clause does not apply to a Conference member's acceptance of a proportionate share of partnership earnings attributable to his or her law firm's representation of a foreign government. ACUS argues that such payments are not emoluments "from" a foreign State, but rather from the partnership itself. ACUS Letter at 2-3. In support of that analysis, ACUS cites an opinion of this Office, *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156 (1982). In that opinion, we considered the question whether an employee of the Nuclear Regulatory Commission ("NRC") was authorized to work on his leave time for an American consulting firm on a contract to design a nuclear power plant being built by an electrical commission of the Mexican government. The employee was to be paid by the consulting firm from funds received from the Mexican government in connection with the contract, although not all the proceeds of the contract were to go to him. On the facts, we concluded that "ultimate control, including selection of personnel, remains with the Mexican government," so that "the interposition of the American corporation [does not] relieve[] the NRC employee of the obligations imposed by the Emoluments Clause." *Id.* at 158-59. ACUS infers that this opinion "strongly suggests that the receipt of income from a partnership arrangement, standing alone, does not violate the Constitutional prohibition" on accepting emoluments from a foreign State. ACUS Letter at 2.

We agree with ACUS that our prior opinions suggest that when an employment relationship formally exists between a domestic employer and a Federal officeholder, the question whether the latter may be paid from foreign governmental funds that the employer receives turns on whether the employer is acting as a mere conduit for those funds. This test may be illustrated by contrasting the opinion that ACUS cites (which found that the foreign government would in effect be paying for the covered person's services) with an earlier opinion that arrived at a different result. In Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with [X's] Trip to Indonesia* (Aug. 11, 1980), we considered a proposed contract under which Harvard University provided expert consultants to the government of Indonesia. The Indonesian government had no control over the selection of the experts and their payments, nor had it sought to influence the selection of experts during the years in which the consulting relationship had been in effect. We concluded in that case that the payment of the individual consultant would not be "from" the foreign government, but rather from the employing university.[4] *Id.* at 5.

---

[4] The Comptroller General appears to have adopted the same tests for determining whether a proposed payment from a domestic employer would violate the Emoluments Clause. In 69 Comp Gen. 220 (1990), reconsidering and affirming 65 Comp Gen. 382 (1986), the General Accounting Office ruled that a retired military officer employed under a contract between a domestic corporation and the Saudi Arabian Navy was subject to the Emoluments Clause There was sufficient evidence to conclude that the officer "is in actuality an employee of the Royal Saudi Naval Forces since this entity may control and supervise him as well as

In the present case, our inquiry focuses on the partnership relation rather than the employer-employee relation. "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business *and when there is community of interest in the profits and losses.*" *Commissioner v. Tower*, 327 U.S. 280, 286 (1946) (emphasis added); *see also Meehan v. Valentine*, 145 U.S. 611, 623 (1892) ("those persons are partners, who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions."). There is typically no such community of interest or proportionate sharing of profits in the employment relation. Hence, our precedents in the employment area, while relevant and suggestive, are not directly on point.

ACUS contends that, "absent some direct personal contact or relationship between the Conference member and a foreign government," the member should not be barred from accepting "a proportionate share of partnership earnings . . . solely because his or her firm has a foreign government among its clients." ACUS Letter at 3. To the extent that our opinions in the employment area suggest that the proper test is whether the domestic employer or the foreign government has the power to *control* the covered person's activity, those opinions lend some support to ACUS's argument. A Conference member who did not personally represent a foreign government, and indeed had no personal contact with that client of the firm, could not be said to be subject to the foreign government's "control" in his or her activities on behalf of the partnership. But we think that this consideration is not decisive. More important, in our view, is the fact that the Conference member would draw a proportionate share of the partnership's pooled profits, which would include any profits the firm earned from representing its foreign governmental client. Because the amount the Conference member would receive from the partnership's profits would be a function of the amount paid to the firm by the foreign government, the partnership would in effect be a conduit for that government. Thus, some portion of the member's income could fairly be attributed to a foreign government. We believe that acceptance of that portion of the member's partnership share would constitute a prohibited emolument.

ACUS points out that our April 1991 Opinion stated that 18 U.S.C. § 219 does not implicitly disqualify an individual from serving on an advisory committee simply because he or she is a partner at a firm that is required by statute to register as a foreign agent. *See* ACUS Letter at 3; 15 Op. O.L.C. at 66 n.4. ACUS urges that we adopt a similar conclusion with respect to the Emoluments Clause. Section 219, a criminal statute, makes it an offense for a public official (including members of advisory committees covered by the Federal Advisory Committee Act, 5 U.S.C.

---

terminate his employment." 65 Comp. Gen at 385 Similarly, the General Accounting Office ruled that a retired military officer who was employed and paid by a domestic corporation and then assigned to work for an Israeli government instrumentality was within the Clause It was shown that the domestic corporation was in effect merely an employment agency, and that the officer was actually working for the foreign government that had procured his services *See* 53 Comp Gen 753 (1974).

app. 2, §§ 1-16) to be or act as the agent of certain foreign principals. We think that the action of one partner acting as such a foreign agent cannot under this criminal statute be fairly imputed to another partner who serves on an advisory committee. But it by no means follows that a partner does not receive income from a foreign government within the meaning of the Emoluments Clause when an identifiable portion of his or her partnership draw can be attributed to the partnership's fees from such a client.

Accordingly, we conclude that, absent the consent of Congress, the Emoluments Clause would prohibit members of the Conference from accepting a share of partnership earnings, where some portion of that share is derived from the partnership's representation of a foreign government.

## B.

ACUS further informs us that some private Conference members from time to time have among their personal clients foreign government-owned or -controlled instrumentalities, or business or proprietary corporations in which foreign governments have ownership interests. Other Conference members may from time to time receive payment for teaching at foreign public universities. ACUS Letter at 2.

ACUS suggests that payments accepted by private members for services rendered to a foreign government should not be considered to be forbidden emoluments when such a government is acting through commercial instrumentalities that it owns or controls, or through public academic institutions. *See* ACUS Letter at 3-4. Such payments, ACUS suggests, would not not be accepted "from any . . . foreign State."

We deal first with the question of foreign government-owned or -controlled commercial enterprises. In our opinion, such a corporation should indeed be considered to be a "foreign State" within the meaning of the Emoluments Clause. *Accord* 53 Comp. Gen. at 756 (corporation owned by government of Israel held within purview of Clause). It may be true, as ACUS says, that when foreign governments act in their commercial capacities, they do not exercise powers peculiar to sovereigns. *See* ACUS Letter at 3 (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 704 (1976)); *but see id.* at 715 (Powell, J , concurring) ("the line between commercial and political acts of a foreign state often will be difficult to delineate").[5] But nothing in the text of the Emoluments Clause limits its application solely to foreign governments acting *as sovereigns.*

---

[5] In *Dunhill,* the Court declined to extend the Act of State doctrine "to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities " 425 U S. at 695. The case is at best marginally relevant to the issues here. Moreover, underlying the presumptive distinction between foreign governmental business corporations and the sovereigns that own or control them are concerns for "economic development and efficient administration," reinforced by "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity." *First Nat'l City Bank v Banco Para El Comercio,* 462 U.S. 611, 626 (1983) But even in commercial contexts where concerns for economy and

The language of the Emoluments Clause is both sweeping and unqualified. *See* 49 Comp. Gen. 819, 821 (1970) (the "drafters [of the Clause] intended the prohibition to have the broadest possible scope and applicability"). It prohibits those holding offices of profit or trust under the United States from accepting "*any* present, Emolument, Office, or Title, *of any kind whatever*" from "*any* . . . foreign State" unless Congress consents. U.S. Const. art. I, § 9, cl. 8 (emphasis added). There is no express or implied exception for emoluments received from foreign States when the latter act in some capacity other than the performance of their political or diplomatic functions. The decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause.

Moreover, a foreign government's ownership or control of a corporation may render the corporation that government's agent. *See First Nat'l City Bank v. Banco Para El Commercio*, 462 U.S. at 629. Indeed, as the Court has noted, "[a] typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed *by a board selected by the government in a manner consistent with the enabling law." Id.* at 624 (emphasis added). We believe that the Emoluments Clause should be interpreted to guard against the risk that occupants of Federal office will be paid by corporations that are, or are susceptible of becoming, agents of foreign States, or that are typically administered by boards selected by foreign States. Accordingly, we think that, in general, business corporations owned or controlled by foreign governments will fall within the Clause.[6]

The question whether the Emoluments Clause extends to foreign public universities is somewhat more difficult. Our prior opinions on this subject have not been a seamless web. Thus, in Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986), we concluded that while the University of New South Wales was clearly a public institution, it was not so clear that it was a "foreign State" under the Emoluments Clause, given its functional and operational independence from the government of Australia and state political instrumentalities. Accordingly, we opined that the question posed there — whether a NASA employee could accept a

---

efficiency loom larger than they do here, the Court has been prepared to hold that presumptive distinction overcome *Id* at 630-33

[6] We acknowledge that the Foreign Gifts and Decorations Act, which provides Congress's consent to certain transactions otherwise forbidden by the Emoluments Clause, does not expressly subsume corporations owned or controlled by foreign States within its definition of a "foreign government." *See* 5 U S.C § 7342(a)(2) Rather, that definition extends primarily to "any unit of foreign governmental authority," *id.* § 7342(a)(2)(A), and it is plausible to argue that such corporations are not units of governmental authority. However, we do not assume that the Act's definition is necessarily coextensive with the constitutional concept of a "foreign State."

fee of $150 for reviewing a Ph.D. thesis — had to be answered by considering the particular circumstances of the case, in order to determine whether the proposed arrangement had the potential for corruption or improper foreign influence of the kind that the Emoluments Clause was designed to address. On other occasions, however, we have construed the Emoluments Clause to apply to public institutions of higher education in foreign countries.[7]

In support of its view that the Emoluments Clause does not apply to foreign public universities, ACUS argues that the Clause was designed to guard against the exercise of improper influence on Federal office-holders by the political or diplomatic agencies of foreign States, because payments by those agencies are most likely to create a conflict between the recipient's Federal employment and his or her outside activity. *See* ACUS Letter at 4. Because public universities do not generally perform political or diplomatic functions, they ought not, on ACUS's analysis, to be brought within the Clause. We think, however, that the contrary view is the better one.

To begin with, we reiterate that the language of the Emoluments Clause does not warrant any distinction between the various capacities in which a foreign State may act. *Any* emoluments from a foreign State, whether dispensed through its political or diplomatic arms or through other agencies, are forbidden to Federal office-holders (unless Congress consents). Further, it serves the policy behind the Emoluments Clause to construe it to apply to foreign States even when they act through instrumentalities which, like universities, do not perform political or diplomatic functions. Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. *See* 10 Op. O.L.C. at 100. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government, even when those benefits took the form of remuneration for academic work or research.[8] Thus, United States Government officers or employees might well find themselves exposed to conflicting claims on their interests and loyalties if they were permitted to accept employment at foreign public universities.

Finally, Congress has exercised its power under the Emoluments Clause to create a limited exception for academic research at foreign public institutions of learning. The Foreign Gifts and Decorations Act provides in part that Federal em-

---

[7] *See, e g*, Memorandum for Files from Robert J. Delahunty, Acting Special Counsel, Office of Legal Counsel, *Re: Applicability of Emoluments Clause to Employment of CFTC Attorney by East China Institute of Politics and Law* (Aug 27, 1992), Memorandum for Files from Barbara E Armacost, Attorney-Adviser, Office of Legal Counsel, *Re Emoluments Clause and Appointment to the President's Committee on the Arts and Humanities* (Nov. 15, 1990) The General Accounting Office has reached a similar result *See* 44 Comp Gen 130 (1964) (retired Coast Guard officer subject to recall to active duty held not entitled to retirement pay for period in which he was teaching for the Department of Education of the State of Tasmania, Australia)

[8] Consistent with this view, we have opined that an employee of the National Archives could not serve on an international commission of historians created and funded by the Austrian Government to review the wartime record of Dr. Kurt Waldheim, the President of Austria *See Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op O.L.C 89 (1987)

ployees may accept from foreign governmental sources "a gift of more than minimal value when such gift is in the nature of an educational scholarship." 5 U.S.C. § 7342(c)(1)(B).[9] Thus, Congress has recognized that foreign governmental bodies may wish to reward or encourage scholarly or scientific work by employees of our Government, but has carefully delimited the circumstances in which Federal employees may accept such honors or emoluments. That suggests that Congress believes both that the Emoluments Clause extends to paid academic work by Federal employees at foreign public universities, and that the Clause's prohibition on such activity should generally remain in force.

Accordingly, we conclude that foreign governmental entities, including public universities, can and presumptively do constitute instrumentalities of foreign States under the Emoluments Clause, even if they do not engage specifically in political or diplomatic functions.[10]

## Conclusion

Non-government members of the Administrative Conference are prohibited by the Emoluments Clause from accepting a distribution from their partnerships that includes some proportionate share of the revenues generated from the firm's foreign government clients.

Similarly, non-government members of the Conference are in general forbidden by the Emoluments Clause from accepting payments from commercial entities owned or controlled by foreign States. This prohibition also extends to the acceptance of payments for teaching at foreign universities that are instrumentalities of foreign States.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[9] We have opined that this exception applied to an award of approximately $24,000 by a foundation acting on behalf of the West German Government to a scientist employed by the Naval Research Laboratory We reasoned that a "program designed to honor United States scientists and enable them 'to stay for an extended period at research institutes in the Federal Republic of Germany to carry out research of the Awardee's own choice' seems to be in the nature of an educational scholarship, acceptance of which Congress has permitted " Letter for Walter T Skallerup, Jr., General Counsel, Department of the Navy, from Robert B Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 4 (Mar. 17, 1983)

[10] ACUS points out that it is an advisory committee, and that "the nature of an advisory committee is that an individual — or even the committee as a whole — cannot determine the course of governmental action " ACUS Letter at 4 But, as we have noted above, ACUS is also, by statute, a Federal *agency.* Moreover, even considered solely as an advisory committee, ACUS could influence governmental decisionmaking. *See Association of Am Physicians and Surgeons, Inc v Clinton,* 997 F 2d 898, 913-14 (D.C. Cir. 1993) Hence, the advisory nature of ACUS does not render it immune from the possibility that a foreign State might exert improper influence on and through it ACUS also objects that "[i]t would be particularly unusual for a recommendation by the Administrative Conference to be of significant interest to a foreign government " ACUS Letter at 5 But there may be no way of fine-tuning the prohibitions on the acceptance of foreign governmental emoluments to reach precisely such "unusual" cases In any event, the Constitution itself lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications